# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: October 1, 2020

```
* * * * * * * * * * * * * **
HEATHER TUMOLO,                    *      PUBLISHED
                                   *
              Petitioner,          *      No. 16-343V
                                   *
v.                                 *      Special Master Nora Beth Dorsey
                                   *
SECRETARY OF HEALTH                *      Pain and Suffering; Out-of-Pocket
AND HUMAN SERVICES,                *      Expenses; Influenza ("Flu") Vaccine;
                                   *      Shoulder Injury Related to Vaccine
              Respondent.          *      Administration ("SIRVA").
                                   *
* * * * * * * * * * * * * **
```

Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA, for petitioner.
Jennifer Leigh Reynaud, U.S. Department of Justice, Washington, DC, for respondent.

## DAMAGES DECISION[1]

On March 16, 2016, Heather Tumolo[2] ("petitioner" or "Ms. Tumolo") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, et seq.,[3] (the "Vaccine Act" or "the Program"). Petitioner alleges that she suffered a left shoulder injury caused by her September 30, 2014 influenza ("flu") vaccination. Petition at 1 (ECF No. 1). On March 15, 2019, the undersigned issued a ruling on entitlement, finding that

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] Petitioner filed this case as Heather Gillotti. On October 1, 2020, the Court granted petitioner's motion to amend the case caption to reflect petitioner's name change to Heather Tumolo. Order dated Oct. 1, 2020 (ECF No. 98).

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

petitioner was entitled to compensation.  Ruling on Entitlement dated March 15, 2019 (ECF No. 64).

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs.  Petitioner's ("Pet.") Status Report ("Rept."), filed Mar. 15, 2019 (ECF No. 66).  Since then, additional expert reports and briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that petitioner is entitled to $170,000.00 for actual pain and suffering, and $1,926.60[4] for out-of-pocket medical expenses, for a total award of $171,926.60.

## I.    PROCEDURAL HISTORY

The petition was filed on March 16, 2016, along with the vaccine administration record and medical records.  Pet. Exhibits ("Exs.") 1-4.  The case was assigned to the Special Processing Unit ("SPU").  Subsequently, petitioner filed additional records and a statement of completion.  Pet. Exs. 5-8; Statement of Completion, filed Sept. 22, 2016 (ECF No. 16).  On October 13, 2017, respondent filed a Rule 4(c) Report, in which he stated that compensation was not appropriate because there was insufficient evidence as to onset of petitioner's shoulder pain.  Respondent's ("Resp.") Rept. at 7 (ECF No. 37).

On July 23, 2018, petitioner filed her Motion for Fact Ruling as to onset.  Pet. Motion for Fact Ruling in Regard to the Onset of Petitioner's Symptoms, filed on July 23, 2018 (ECF No. 53).  Respondent filed no response and a fact ruling issued on October 3, 2018, finding that onset of petitioner's left shoulder injury occurred within 48 hours of the receipt of her September 30, 2014 flu vaccine.  Fact Ruling dated Oct. 3, 2018, at 2 (ECF No. 54).  Thereafter, respondent issued an Amended Report, acknowledging the factual finding as to onset, and while preserving the right to appeal the ruling, advised he would not defend the case.  Amended ("Am.") Resp. Rept. at 2 (ECF No. 63).  Respondent also requested a ruling on entitlement, which was issued in favor of petitioner on March 15, 2019.  Id.; Ruling on Entitlement dated Mar. 15, 2019 (ECF No. 64).

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs.  Pet. Status Rept., filed Mar. 15, 2019 (ECF No. 66).  Expert reports were filed on the relevant damages issues.  See Pet. Exs. 22-23; Resp. Ex. A.  The parties have now submitted their respective briefs outlining their positions on damages.

This matter is now ripe for adjudication.

---

[4] The parties agreed on the total out-of-pocket expenses for costs occurring prior to 2018 in the amount of $1,780.45.  Pet. Supplemental Brief in Support of Damages ("Pet. Supp. Br."), filed on July 29, 2020, at 6 (ECF No. 92).  Petitioner requests an additional $146.15, for treatment beginning in 2018, to which respondent did not agree.  Id.  The undersigned finds these costs compensable and award them in full.  Thus, the total for out-of-pocket expenses is $1,926.60.

## II.      FACTUAL HISTORY

### A.      Factual Summary

In the interest of efficiency, the following summary is taken directly from petitioner's damages brief filed on May 15, 2019.[5]  See Pet. Brief in Support of Damages ("Pet. Br."), filed May 15, 2019, at 2-6 (ECF No. 71).  The undersigned finds the factual summary to be, in general, an accurate recitation of the facts set forth in the medical records and affidavits.

On September 30, 2014, Ms. Tumolo received the flu vaccine in her left shoulder at CVS Pharmacy located at 312 S. Henderson Road, King of Prussia, PA 19406.  Pet. Ex. 1.  Immediately following the vaccination, Ms. Tumolo felt severe pain in her left shoulder.  Pet. Ex. 9 at 1.  Over the next few weeks, Ms. Tumolo continued to experience severe pain and developed limited range of motion in her left arm.  Id.

On October 16, 2014, Ms. Tumolo presented to Dr. Mark Testa at Steingard and Testa Medical Associates with pain in her left shoulder.  Dr. Testa prescribed Ibuprofen and referred Ms. Tumolo to physical therapy ("PT").  Pet. Ex. 2 at 13.  Ms. Tumolo returned to Dr. Testa on October 30, 2014, and was re-prescribed Ibuprofen.  Id. at 12.

On October 31, 2014, Ms. Tumolo underwent X-rays of her left shoulder at Jefferson Associates in Radiology.  The images revealed no fracture or dislocation, normal acromioclavicular and glenohumeral joints, and no significant degenerative changes.  Pet. Ex. 3 at 6.  Over the next several weeks, Ms. Tumolo continued to experience pain in her left shoulder which became so severe that she had difficulty raising her left arm and driving to work.  Pet. Ex. 9 at 2.  Ms. Tumolo made arrangements with her employer to begin working from home.  She was unable to seek additional medical treatment as she was without insurance.  See Pet. Ex. 10.

On March 12, 2015, Ms. Tumolo returned to Dr. Testa with continued pain in her left shoulder.  Dr. Testa referred Ms. Tumolo to PT and recommended Aleve for pain management.  Pet. Ex. 2 at 11.  On March 19, 2015, Ms. Tumolo underwent an initial PT evaluation at NovaCare Rehabilitation.  Ms. Tumolo was prescribed a course of therapy three (3) times per week for six (6) weeks.  Pet. Ex. 4 at 3-7.

On April 9, 2015, Ms. Tumolo followed-up with Dr. Testa and reported ongoing pain in her left shoulder.  Dr. Testa instructed Ms. Tumolo to continue attending PT and referred her to an orthopedist for further evaluation.  Pet. Ex. 2 at 10.  On June 6, 2015, Ms. Tumolo underwent an MRI of her left shoulder.  The findings on the MRI revealed:  (1) moderate supraspinatus tendinosis with a low-grade partial thickness interstitial tear, (2) mild

---

[5] While this summary is taken directly from petitioner's brief, the petitioner's name and citations to the record have been changed to reflect the change of caption and citation style preferred by the undersigned and used throughout this Decision.  See Pet. Brief in Support of Damages ("Pet. Brief"), filed May 15, 2019, at 2-6 (ECF No. 71).  For an additional recitation of facts, see Resp. Rept. at 1-4; Am. Resp. Rept. at 2-7.

subscapularis tendinosis, (3) mild long head biceps tendinosis, and (4) mild subacromial/subdeltoid bursitis.  Pet. Ex. 3 at 4-5.

On June 26, 2015, Ms. Tumolo presented to Dr. Joseph Abboud at the Rothman Institute with persistent pain in her left shoulder.  Ms. Tumolo reported that on September 30, 2014, she had a flu shot at CVS and shortly thereafter developed severe pain in her left shoulder.  Dr. Abboud reviewed the results of Ms. Tumolo's MRI, which showed findings consistent with tendinosis.  Pet. Ex. 3 at 8-9.  Dr. Abboud's opinion was that Ms. Tumolo's symptoms were either from a reaction to the injection itself or improper placement of the injection into the rotator cuff tissue.  Dr. Abboud recommended conservative management and a corticosteroid injection if Ms. Tumolo's symptoms failed to improve.  Id.

On August 31, 2015, Ms. Tumolo followed-up with Dr. Abboud.  Ms. Tumolo reported having some residual pain in her left shoulder, but noticed gradual improvements since her last appointment in June.  Ms. Tumolo was instructed to return on an as needed basis.  Pet. Ex. 3 at 7.  On September 10, 2015, Ms. Tumolo followed-up with Dr. Testa, complaining of continued left shoulder pain.  Pet. Ex. 2 at 6.  Dr. Testa advised Ms. Tumolo to follow-up as needed with Dr. Abboud.  Ms. Tumolo returned to Dr. Abboud on March 9, 2016, complaining of continued discomfort in the left shoulder region.  Pet. Ex. 8 at 8.  A second MRI of the left shoulder was performed on that day, revealing an area of reactive bony impingement of the humeral head, which was more pronounced that her previous MRI.  Dr. Abboud also administered a corticosteroid injection during this visit.  Pet. Ex. 14 at 41-42.

Throughout her treatment, Ms. Tumolo was instructed to maintain an active lifestyle and continue strengthening her arm and shoulder.  In doing so, Ms. Tumolo aggravated her shoulder injury at the gym and subsequently presented to Dr. Daniel Bronsnick at Aria 3B Orthopaedic Specialists with complaints of shoulder pain on May 12, 2016.  Pet. Ex. 6 at 3-4.  Ms. Tumolo was exhibiting signs and symptoms consistent with rotator cuff impingement, and Dr. Bronsnick ordered a third MRI of the left shoulder.  Id.

On July 27, 2016, Ms. Tumolo presented to Dr. William Morrison at Jefferson University Hospital to undergo a third MRI of the left shoulder.  This MRI revealed: (1) mild supraspinatus and infraspinatus tendinosis with mild interstitial tearing; and (2) minimal subacromial/subdeltoid bursitis.  Pet. Ex. 14 at 39-40.  On August 17, 2016, Ms. Tumolo followed up with Dr. Abboud due to continued left shoulder pain.  Dr. Abboud diagnosed Ms. Tumolo with a sprain of the left rotator cuff capsule and noted more tendinosis in the shoulder than expected based on Ms. Tumolo's young age.  Dr. Abboud again instructed Ms. Tumolo to return as needed.  Id. at 24.

On June 15, 2018, Ms. Tumolo returned to Dr. Abboud, complaining of recurring, painful symptoms over the past two (2) months.  Pet. Ex. 14 at 21-22.  Dr. Abboud noted weakness on the left side and discomfort with the acromioclavicular joint crossover testing and external rotation.  As such, he performed a cortisone injection into the left shoulder and instructed Ms. Tumolo to continue with her home exercise program.  Id.

On July 16, 2018, Ms. Tumolo presented to Dr. Diane Deely at Jefferson University Hospital to undergo another MRI of the left shoulder due to continued pain. This diagnostic exam revealed: (1) rotator cuff tendinopathy with low-grade partial-thickness undersurface tearing of the supraspinatus; and (2) intense bone marrow edema within the distal clavicle with subchondral resorption. Pet. Ex. 14 at 37-38.

On July 20, 2018, Ms. Tumolo returned to Dr. Abboud. Considering the failure of conservative modalities and nonoperative management, Dr. Abboud recommended arthroscopic surgery which was scheduled for August 23, 2018. Pet. Ex. 14 at 15-16. However, Ms. Tumolo telephoned Dr. Abboud's office just three days later and requested an earlier surgery date due to increased pain. Id. at 14. Accordingly, Ms. Tumolo presented to Dr. Abboud at the Jefferson Surgical Center on August 2, 2018 for a surgical arthroscopy of the left shoulder with subacromial decompression and distal clavicle resection. Id. at 48-50.

On August 17, 2018, Ms. Tumolo returned to Dr. Abboud for suture removal. Dr. Abboud instructed Ms. Tumolo to begin PT and to return in five (5) weeks. Pet. Ex. 14 at 11. Ms. Tumolo presented to William Metz, PT, at Premier Physical Therapy on August 21, 2018. Ms. Tumolo was instructed to complete two (2) to three (3) sessions of PT per week for four (4) to five (5) weeks. Thereafter, Ms. Tumolo returned to William Metz, PT, for nine (9) additional therapy sessions through October 25, 2018. Pet. Ex. 15 at 2-15.

Ms. Tumolo returned to Dr. Abboud on September 21, 2018 and November 2, 2018. On both occasions, Dr. Abboud instructed Ms. Tumolo to continue working on stretching and strengthening exercises. Pet. Ex. 14 at 7-9. At the present time, Ms. Tumolo continues to experience pain and lack of mobility in her left shoulder despite this extensive treatment. She most recently returned to Dr. Abboud on February 27, 2019. Pet. Ex. 16 at 9.

## B. Physical Therapy Records

In addition to the records summarized above, PT notes are also relevant to the undersigned's decision. A chart of with some pertinent information from petitioner's PT records appears below. Petitioner attended six PT visits at NovaCare Rehabilitation from March 19, 2015 to May 21, 2015. Pet. Ex. 4 at 3-35. After shoulder surgery on August 2, 2018, petitioner attended nine PT sessions from August 21, 2018 until October 25, 2018. Pet. Ex. 15 at 2-10.

| 3/19/15 Initial Visit | Moderate loss of function; moderate loss of motion; moderate degree of weakness; pain severity 8/10. Pet. Ex. 4 at 3. |
|---|---|
| 3/25/15 Visit #2 | Pain severity 8/10. Pet. Ex. 4 at 11. |
| 4/1/15 Visit #3 | Current severity 7/10, 8/10. Pet. Ex. 4 at 14. Stiff and sore, tired and fatigued. Id. A little better. Id. |
| 4/15/15 Visit #4 | Current severity 6/10, 7/10. Pet. Ex. 4 at 17. Perceived improvement 15-20%. Id. Instructed in home exercise program. Id. at 25. |

| | |
|---|---|
| 4/23/15 Visit #5 | Current severity 6/10.  Pet. Ex. 4 at 27.  Mobility increased, strength increased, pain decreased, and range of motion increased.  Id. at 32. |
| 5/21/15 Visit #6 | Current severity 6/10.  Pet. Ex. 4 at 33.  Patient's prognosis at time of discharge is excellent.  Id. at 34.  ADL improvements.  Id. at 35.  Completed current program. Id.  Patient self-discharge.  Id.  Daniel E. Walls, PT. |
| 8/2/18 | Shoulder surgery – left shoulder subacromial decompression and distal clavicle resection.  Pet. Ex. 14 at 48-50. |
| 8/21/18 Post op Visit #1 | PT evaluation status post-surgery (8/2/18).  Pet. Ex. 15 at 11.  Difficulty and increased pain with gripping and lifting using left arm and shoulder.  Id. at 12. Pain of 2/10 to 4/10.  Id.  William Metz, DPT |
| 10/25/18 Post op Visit #9 | Chief complaints: pain, stiffness, soreness, and weakness.  Pet. Ex. 15 at 2.  No pain scale assessment.  See id.  Tolerance to exercise, activity fair with pain/difficulty.  Id. |

### C.     Most Recent Records

Petitioner had several follow-up postoperative visits with Dr. Abboud in 2018 and one in 2019.  Records from these visits provide the most recent information as to petitioner's condition and prognosis.

On September 21, 2018, petitioner saw Dr. Abboud who documented that petitioner's surgical sites were healed, and that she was progressing with "her flexibility." Pet. Ex. 14 at 9.  Petitioner had "active range of motion."  Id.  Dr. Abboud was "pleased with [petitioner's] progress."  Id.  There is no suggestion that petitioner was diagnosed by Dr. Abboud with any permanent disability or that her prognosis was not good.

Petitioner next saw Joseph McFarland, NP, at Dr. Abboud's office, on November 2, 2019.  Pet. Ex. 14 at 7.  Mr. McFarland noted that petitioner was approximately three months postoperative from her shoulder surgery.  Id.  Petitioner was "doing much better." Id.  She "ha[d] some residual stiffness" and discomfort when elevating her shoulder but no longer had pain with adduction.  Id.  She had "full range of motion" and "[g]ood strength." Id.  Petitioner was to continue PT once per week.  Id.  There is nothing in the medical record from that visit to indicate that petitioner had any permanent disability or that she was not expected to have a good recovery.

At her last visit to Dr. Abboud, petitioner was "doing fairly well" and had "[n]o significant pain."  Pet. Ex. 16 at 9.  She had some discomfort when raising her arm above 90 degrees, but otherwise had good flexibility and muscle tone with no atrophy.  Id.  Dr. Abboud noted that petitioner was "improved compared to her preoperative status."  Id.  He advised petitioner to return in one year, or if she was feeling well, she could cancel the one

year appointment.  Id.  Dr. Abboud did not document that petitioner had any permanent disability, nor did he document any concerns regarding petitioner's future prognosis.

### D.  Affidavits

In support of her petition, petitioner submitted an affidavit, as well as affidavits from lay witnesses.

### i.  Petitioner's Affidavit

Petitioner executed an affidavit on April 6, 2019.  She received the flu vaccination at issue on September 30, 2014, at CVS.  Pet. Ex. 18 at ¶ 3.  The vaccine was given higher than usual, and later that day, she felt that her shoulder was "'freezing' up."  Id. at ¶ 6.  Over the next several days, she was unable to use her left arm, and couldn't sleep due to left shoulder pain.  Id.  At the time she was commuting for work, and her shoulder pain made driving difficult.  Id. at ¶ 5.  Eventually, she took a job closer to home, with lower pay.  Id.  Her job at the dental office inspired her to train as a dental hygienist.  Id.  Petitioner did not want to take narcotics for fear of addiction, and so she endured "tremendous pain."  Id. ¶ 10.  Her sleep was affected, she had difficulty driving, was unable to clean her house, or fully raise her arm above her head.  Id.  She tried massage therapy, physical therapy, and four years later had arthroscopic surgery.  Id. at ¶¶ 11-12.

Post-operatively, petitioner continued to have tightness and aching pain, and limited range of motion.  Pet. Ex. 18 at ¶ 13.  Prior to her vaccine injury, petitioner enjoyed pole dance fitness, but has been unable to return to this activity.  Id. at ¶ 14.  On her honeymoon, and vacations, she has been limited in her activities.  Id.

The injury made petitioner dependent on her fiancé and caused depression and anxiety.  Pet. Ex. 18 at ¶ 16.  Petitioner felt isolated and depressed for approximately two years due to her shoulder injury.  Id. at ¶ 17.

As of the date of her affidavit (April 6, 2019), petitioner continued to have aching type pain that she rated as 2/10 to 3/10.  Pet. Ex. 18 at ¶ 18.  She also reported muscle aches and soreness, and lack of full range of motion.  Id. at ¶¶ 18-19.  Petitioner averred that she was unable to engage in vigorous exercise because she could not lift or do repetitive activity with her arm.  Id. at ¶ 21.  While excited about her pregnancy, petitioner feared that her shoulder injury would prevent her from enjoying activities with her children.  Id. at ¶ 23.

### ii.  Affidavit of Petitioner's Husband, Jim Tumolo

Mr. Tumolo met his wife in 2013, when she was 24 years old.  Pet. Ex. 19 at ¶ 1.  While dating, the couple enjoyed "pick-up sports with friends, water sports, rock climbing[,] and fishing."  Id.  They "loved to travel and try new things."  Id.  After her shoulder injury, petitioner was in terrible, agonizing pain.  Id. at ¶ 2.  She had difficulty driving.  Id.  If Mr. Tumolo touched petitioner's injured shoulder, she would react with pain.  Id.  She lost interest in sports and outdoor activities.  Id.

After they married, the couple continued to take trips, but petitioner's activities were limited, and she did not engage in sports or activities that required the use of her shoulder. Pet. Ex. 19 at ¶ 3. Mr. Tumolo described the effect of his wife's shoulder injury on her sleep and their intimate relationship. See id. at ¶¶ 4-5. He also averred that petitioner is fearful of the effect that her shoulder injury will have on her ability to care for her child. Id. at ¶ 6.

Mr. Tumolo described his wife's dependence on him after she underwent shoulder surgery. See Pet. Ex. 19 at ¶ 8. She had severe pain and was unable to perform even simple tasks. Id. Although petitioner has improved due to surgery, Mr. Tumolo averred that she is still in pain. Id.

### iii.    Affidavit of Kelsie Ticcino

Ms. Ticcino averred that she and petitioner have been friends for many years, and were close while petitioner attended dental hygiene school. Pet. Ex. 20 at ¶ 1. Although petitioner was reluctant to apply to school due to her shoulder injury, she did well in her clinical program, even though she was in pain. Id. at ¶ 2. Ms. Ticcino recounted a school project, requiring petitioner to use a professional camera to photograph the mouth, that was difficult for petitioner due to her shoulder pain. Id.

As of the date of her affidavit, notarized on March 29, 2019, Ms. Ticcino stated that petitioner continued to have pain on a daily basis after work. Pet. Ex. 20 at ¶ 3. Ms. Ticcino stated that petitioner was unsure whether she would be able to continue working due to her injury. Id.

### iv.    Affidavit of Melanie Daniels

Ms. Daniels is also a friend of the petitioner. Pet. Ex. 21 at ¶ 1. She described how petitioner had to push herself through dental hygiene school, "despite her pain and injury." Id. at ¶ 2. Prior to her shoulder injury, petitioner had begun a new "aerial fitness program with silk ropes and fun pole acrobatics," but due to her injury, she was unable to continue the program. Id. at ¶ 3. Ms. Daniels stated that petitioner was frustrated that she was unable to participate in activities that she previously enjoyed. Id. Ms. Daniels also averred that petitioner was "afraid that her injury will hold her back from all the activities she could've done with kids had she not been injured." Id. at ¶ 4.

### E.    Expert Reports

### i.    Petitioner's Expert, Dr. G. Russell Huffman

Dr. Huffman is an Associate Professor of Orthopedic Surgery and the Director of Shoulder and Elbow Fellowship program at the University of Pennsylvania, and in those roles, he has cared for patients with shoulder problems for more than 12 years. Pet. Ex. 11 at 1. Dr. Huffman has "diagnosed and treated SIRVA patients" for eight years, and currently has an "ongoing institutional review board protocol . . . investigating this issue." Id. Prior to preparing his initial expert report, dated January 23, 2018, Dr. Huffman reviewed petitioner's medical

records from 2014 to 2016, the petition, petitioner's affidavit, and respondent's Rule 4(c) Report. Id. at 1-3.  After reviewing all of the evidence, Dr. Huffman concluded that petitioner's injury fits within the established SIRVA criteria set forth in the Vaccine Injury Table.  Id. at 4-5.

Relevant to the issue of damages is the question of whether petitioner aggravated her shoulder injury while lifting weights or experienced a new and separate injury.  See Pet. Ex. 12 at 1.  To address this question, Dr. Huffman wrote a supplemental report, filed on April 8, 2018. Pet. Ex. 13.  In it, Dr. Huffman opined that petitioner experienced some relief from a cortisone injection, but her pain returned due to the "persistent source of inflammation or an exacerbation of [her] existing problem."  Id. at 1.  Dr. Huffman concluded that the petitioner did not sustain "a new or unique injury."  Id.

Dr. Huffman's third report was filed on November 20, 2019.  Pet. Ex. 22.  In it, he addressed the gap in the petitioner's medical records from 2016 to 2018, the petitioner's symptoms after 2016, and her shoulder surgery on August 2, 2018.  Id. at 1.  After reviewing the medical records and affidavits, Dr. Huffman explained that the gap in treatment from 2016 to 2018 was attributable to that fact that petitioner attended dental hygiene school and got married. Id.  Based on the updated records, affidavits, and Dr. Abboud's surgical report, Dr. Huffman opined that "there was never a time when [Ms. Tumolo] was not adversely affected by her left shoulder injury with complaints of pain and dysfunction."  Id.  Dr. Huffman concluded that the gap in the records "does not equate [to] a gap in symptoms or new onset left shoulder pain."  Id. Further, Dr. Huffman concluded that petitioner's shoulder pain and surgery in 2018 were related to her initial SIRVA injury.  Id. at 1-2.

Subsequently, respondent filed the expert report of Dr. Brian Feeley, described below.  In his report, Dr. Feeley opined that petitioner's distal clavicle osteolysis, was a new injury, not related to her prior SIRVA.  Resp. Ex. A at 4.  In response, Dr. Huffman authored a fourth expert report, filed July 2, 2020, addressing the diagnosis of distal clavicle osteolysis.  Pet. Ex. 23.  Dr. Huffman noted that petitioner's treating orthopedic surgeon, Dr. Abboud, reviewed the July 16, 2018 MRI, and noted that "there was evidence of inflammation at the distal end of the clavicle." Id. at 1-2.  Dr. Huffman explained that this description is consistent with a secondary injury "causally related to the SIRVA injury," in the absence of any other shoulder injury that would explain the finding.  Id. at 2.  The MRI showed "tendinitis, tearing of the supraspinatus, edema[,] and inflammation of the distal clavicle."  Id.  Dr. Huffman stated that "[d]istal clavicle excisions are commonly performed in conjunction with rotator cuff and impingement surgeries and thus are often considered a part or component of rotator cuff pathology."  Id.  Dr. Huffman concluded that the petitioner's "entire course of treatment was related to the September 30, 2014 vaccination, including her surgical procedure."  Id.

### ii.      Respondent's Expert, Dr. Brian Feeley

Dr. Feeley is Professor in Residence in Orthopaedic Surgery at the University of California, San Francisco, where he has practiced since 2008.  Resp. Ex. A at 1.  His practice includes caring for "patients with both shoulder and knee problems" and patients with "shoulder pathologies including rotator cuff injuries, shoulder arthritis, shoulder instability, and adhesive

capsulitis." Id. Dr. Feeley reviewed all of petitioner's medical records, the expert reports by Dr. Huffman, as well as the medical literature cited by Dr. Huffman. Id.

Based on his review of the evidence, Dr. Feeley opined that on August 17, 2016, petitioner "had mild pain" but "was cleared to return to work." Resp. Ex. A at 4. Petitioner "did not return [for medical care or treatment] for almost [two] years, at which time she had new pain and a new injury which was apparent was distal clavicle osteolysis on her MRI," which "appears to be a new pain and would not correspond to . . . her previous SIRVA based injury." Id.

Dr. Feeley enumerated several reasons why he believed that petitioner's "distal clavicle osteolysis" was a new injury. See Resp. Ex. A at 4. First, he noted that petitioner did not seek care for two years. Id. Second, he opined that the "distal clavicle is at least 5 cm" from the site of vaccination, even assuming poor vaccine administration technique. Id. Third, Dr. Feeley stated that "[d]istal clavicle osteolysis is thought to be from overuse, not from a direct injury" and "[i]t has not been previously described as a SIRVA based reaction." Id. Finally, he opined that the clavicle osteolysis was not seen on her 2016 MRI. Id. For these reasons, Dr. Feeley concluded petitioner had a new problem in her shoulder in 2018 that was not due to SIRVA. Id.

### III.    PARTIES' CONTENTIONS

Petitioner seeks an award of $251,926.60, which includes $200,000.00 for past pain and suffering, $50,000.00 for future pain and suffering, and $1,926.60 for out-of-pocket expenses. Pet. Supplemental Brief in Support of Damages ("Pet. Supp. Br."), filed on July 29, 2020, at 1 (ECF No. 92). She asserts this award is appropriate because at the time of vaccination, she was 26 years old and had no prior injury to her left shoulder. Id. at 5. Further, since her vaccination, petitioner has "endured more than four years of significant pain, suffering[,] and treatment, including a surgical procedure." Id. Although there was a period where petitioner did not seek treatment, she asserts that both Dr. Abboud and her expert, Dr. Huffman, support the position that the vaccine caused the injury for which she sought treatment in 2016 and 2018, that led to her need for surgery. Id.

In support of her position, petitioner cites Hooper v. Secretary of Health and Human Services, No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019). Pet. Br. at 7-9. In Hooper, the petitioner experienced a severe left shoulder injury, requiring over two years of treatment, including two steroid injections, two MRIs, and surgery. Id. at 7. Petitioner asserts that like Mr. Hooper, who was a competitive golfer, she experienced "a decline in strength and mobility so severe that she has been unable to participate in [] her usual activities." Id. at 8. She further argues that she suffered severe pain from the date of vaccination until February 2019 (her last visit to Dr. Abboud), "a period of approximately four [] and a half years," while Mr. Hooper was only treated for about two years. Id.

Respondent proposes an award of $51,780.45, consisting of $50,000.00 in pain and suffering and $1,780.45 in unreimbursable medical expenses. Resp. Brief on Damages ("Resp. Br."), filed on June 14, 2019, at 1 (ECF No. 72). Respondent asserts that petitioner's medical records reflect that her "SIRVA injury was mild to moderate . . . and nearly resolved over the course of a year." Id. at 10. Respondent takes the position that the shoulder symptoms

experienced in 2018, which led to surgery, "were due primarily, if not entirely, to her ongoing work as a dental hygienist" and due to an "acute injury" that petitioner sustained while lifting weights. Id. Thus, respondent's recommended award does not take into account the petitioner's clinical course for 2018, or the out-of-pocket medical expenses related to her shoulder injury in 2018. See id.

Respondent cites five cases[6] in support of his position as to the proposed award for pain and suffering, where petitioners were awarded $60,000.00 to $94,900.00, depending on the severity and duration of their pain, as well as facts and circumstances unique to their situation. Resp. Br. at 10-12.

## IV.    LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

---

[6] Desrosiers v. Sec'y of Health & Hum. Servs., No. 16-224V, 2017 WL 5507804, at *5 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding petitioner $85,000.00 for pain and suffering); Dhanoa v. Sec'y of Health & Hum. Servs., No. 15-1011V, 2018 WL 1221922, at *7 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding petitioner $94,900.99 for past and future pain and suffering); Marino v. Sec'y of Health & Hum. Servs., No. 16-622V, 2018 WL 2224736, at *7-9 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding petitioner $75,000.00 in pain and suffering); Knauss v. Sec'y of Health & Hum. Servs., No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding petitioner $60,000.00 for pain and suffering); Dirksen v. Sec'y of Health & Hum. Servs., No. 16-1461V, 2018 WL 629320 (Fed. Cl. Spec. Mstr. Oct. 18, 2018) (awarding petitioner $85,000.00 in actual pain and suffering).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims.[7]  Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merrow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merrow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Graves, 109 Fed. Cl. at 589-90.  Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

Although this case was removed from SPU on September 30, 2019, the undersigned finds statistical data from SIRVA cases resolved in SPU to be informative, as they have an extensive history of informal resolution within the SPU.[8]  As of July 1, 2020, 1,623[9] SIRVA cases have informally resolved within the SPU since its inception in July 2014.  Of those cases, 945 resolved via the government's proffer on award of compensation, following a prior ruling that petitioner is entitled to compensation.[10]  Additionally, 655 SPU SIRVA cases resolved via stipulated agreement of the parties without a prior ruling on entitlement.

---

[7] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell.  For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to the undersigned as the former Chief Special Master, now Special Master Dorsey.

[8] Prior decisions awarding damages, including those resolved by settlement or proffer, are made public and can be searched on the U.S. Court of Federal Claims' website by keyword and/or by special master.  On the Court's main page, click on "Opinions/Orders" to access the database. All figures included in this Decision are derived from a review of the decisions awarding damages within SPU.  All decisions reviewed are, or will be, available publicly.  All figures and calculations cited are approximations.

[9] Additionally, forty-nine claims alleging SIRVA have been dismissed within the SPU.

[10] There have been twenty-three prior cases in which petitioner was found to be entitled to compensation, but where damages were resolved via a stipulated agreement by the parties rather than government proffer.

Among the SPU SIRVA cases resolved via government proffer, awards have typically ranged from $75,000.00 to $120,289.48,[11] with the median award at $93,860.62. Formerly, these awards were presented by the parties as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Since late 2017, the government's proffer has included subtotals for each type of compensation awarded.

Among SPU SIRVA cases resolved via stipulation, awards have typically ranged from $50,000.00 to $91,901.20,[12] with the median award at $70,000.00. In most instances, the parties continue to present the stipulated award as a total agreed upon dollar figure without separately listed amounts for expenses, lost wages, or pain and suffering. Unlike the proffered awards, which purportedly represent full compensation for all of petitioner's damages, stipulated awards also typically represent some degree of litigative risk negotiated by the parties.

Additionally, since the inception of SPU in July 2014, there have been a number of reasoned decisions awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering.

In twenty-two prior SPU cases, petitioners were awarded compensation for pain and suffering below the amount of the median proffer discussed above. These awards for actual pain and suffering ranged from $60,000.00 to $90,000.00.[13] These cases included injuries with a

---

[11] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $25,000.00 to $1,845,047.00. Additionally, one award in a case resolved via government proffer was for an annuity only, the exact amount of which was not determined at the time of judgment. Among the twenty-three SPU SIRVA cases resolved via stipulation following a finding of entitlement, awards range from $45,000.00 to $1,500,000.00, with a median award of $115,772.83. For these awards, the first and third quartiles range from $90,000.00 to $156,026.32.

[12] Typical range refers to cases within the second and third quartiles. Additional outlier awards also exist. The full range of awards spans from $5,000.00 to $509,552.31. Additionally, two stipulated awards were limited to annuities, the exact amounts of which were not determined at the time of judgment.

[13] These cases are Kuhn v. Sec'y of Health & Hum. Servs., No. 18-0091V, 2020 WL 3750994 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $67,500.00 for actual pain and suffering and $1,629.35 for actual unreimbursable expenses); Bartholomew v. Sec'y of Health & Hum. Servs., No. 18-1570V, 2020 WL 3639805 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $67,000.00 for actual pain and suffering); Russano v. Sec'y of Health & Hum. Servs., No. 18-0392V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020) (awarding $80,000.00 for actual pain and $60.54 for actual unreimbursable expenses); Sakovits v. Sec'y of Health & Hum. Servs., No. 17-1028V, 2020 WL 3729420 (Fed. Cl. Spec. Mstr. June 4, 2020) (awarding $68,000.00 for actual pain and suffering and $1,707.72 for actual unreimbursable expenses); Smallwood v. Sec'y of Health & Hum. Servs., No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) (awarding

(. . . continued)

13

"good" prognosis, albeit in some instances with some residual pain.  Petitioners in these cases had mild to moderate limitations in range of motion and MRI imaging likewise showed evidence of mild to moderate pathology such as tendinosis and bursitis.  The duration of injury ranged from six to twenty-nine months and, on average, these petitioners experienced approximately fourteen months of pain.

Significant pain was reported in these cases for up to eight months.  However, in approximately half of the cases, these petitioners subjectively rated their pain as six or below on a ten-point scale.  Petitioners who reported pain in the upper end of the ten-point scale generally suffered pain at this level for three months or less.  Slightly less than one-half were administered

---

$72,500.00 for actual pain and suffering); Dagen v. Sec'y of Health & Hum. Servs., No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) (awarding $65,000.00 for actual pain and suffering and $2,080.14 for actual unreimbursed expenses); Goring v. Sec'y of Health & Hum. Servs., No. 16-1458V, 2019 WL 6049009 (Fed. Cl. Spec. Mstr. Aug. 23, 2019) (awarding $75,000.00 for actual pain and suffering and $200.00 for actual unreimbursable expenses); Lucarelli v. Sec'y of Health & Hum. Servs., No. 16-1721V, 2019 WL 5889235 (Fed. Cl. Spec. Mstr. Aug. 21, 2019) (awarding $80,000.00 for actual pain and suffering and $380.54 for actual unreimbursable expenses); Kent v. Sec'y of Health & Hum. Servs., No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering and $2,564.78 to satisfy petitioner's Medicaid lien); Capasso v. Sec'y Health & Hum. Servs., No. 17-0014V, 2019 WL 5290524 (Fed. Cl. Spec. Mstr. July 10, 2019) (awarding $75,000.00 for actual pain and suffering and $190.00 for actual unreimbursable expenses); Schandel v. Sec'y of Health & Hum. Servs., No. 16-0225V, 2019 WL 5260368 (Fed. Cl. Spec. Mstr. July 8, 2019) (awarding $85,000.00 for actual pain and suffering and $920.03 for actual unreimbursable expenses); Bruegging v. Sec'y of Health & Hum. Servs., No. 17-0261V, 2019 WL 2620957 (awarding $90,000.00 for actual pain and suffering and $1,163.89 for actual unreimbursable expenses); Pruett v. Sec'y of Health & Hum. Servs., No. 17-0561V, 2019 WL 3297083 (Fed. Cl. Spec. Mstr. Apr. 30, 2019) (awarding $75,000.00 for actual pain and suffering and $944.63 for actual unreimbursable expenses); Bordelon v. Sec'y of Health & Hum. Servs., No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (awarding $75,000.00 for actual pain and suffering); Weber v. Sec'y of Health & Hum. Servs., No. 17-0399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for actual pain and suffering and $1,027.83 for actual unreimbursable expenses); Garrett v. Sec'y of Health & Hum. Servs., No. 18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019) (awarding $70,000.00 for actual pain and suffering); Attig v. Sec'y of Health & Hum. Servs., No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019) (awarding $75,000.00 for pain and suffering and $1,386.97 in unreimbursable medical expenses); Dirksen, 2018 WL 6293201 (awarding $85,000.00 for pain and suffering and $1,784.56 in unreimbursable medical expenses); Kim v. Sec'y of Health & Hum. Servs., No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 in unreimbursable medical expenses); Knauss, 2018 WL 3432906 (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); Marino, 2018 WL 2224736 (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); Desrosiers, 2017 WL 5507804 (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses).

one to two cortisone injections.  Most of these petitioners pursued physical therapy for two months or less and none had any surgery.  The petitioners in Schandel, Garrett, Weber, and Bartholomew attended physical therapy from almost four to five months, but most of the physical therapy in Weber focused on conditions unrelated to the petitioner's SIRVA.  Several of these cases (Goring, Lucarelli, Kent, Knauss, Marino, Kim, Dirksen, Smallwood, Sakovits, and Bartholomew) included a delay in seeking treatment.  These delays ranged from about forty-two days in Kim to over six months in Marino.

Additionally, in twelve prior SPU cases, the petitioner was awarded compensation limited to past pain and suffering above the median proffered SIRVA award.  These awards have ranged from $110,000.00 to $160,000.00.[14]  Like those in the preceding group, prognosis was "good."  However, as compared to those petitioners receiving a below-median award, these cases were characterized either by a longer duration of injury or, like the present case, by the need for surgical repair.  Eleven out of twelve underwent some form of shoulder surgery while the twelfth (Cooper) experienced two full years of pain and suffering, eight months of which were considered significant, while seeking extended conservative treatment.  On the whole, MRI imaging in these cases also showed more significant findings.  In nine out of twelve cases, MRI

---

[14] These cases are Meyers v. Sec'y of Health & Hum. Servs., No. 18-0909V, 2020 WL 3755335 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $122,500.00 for pain and suffering); Cates v. Sec'y of Health & Hum. Servs., No. 18-0275V, 2020 WL 3751072 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $108,000.00 for pain and suffering); Rafferty v. Sec'y of Health & Hum. Servs., No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 for pain and suffering and $4,154.04 for actual unreimbursable expenses); Wilt v. Sec'y of Health & Hum. Servs., No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020) (awarding $110,000.00 for pain and suffering and $270.00 for actual unreimbursable expenses); Nute v. Sec'y of Health & Hum. Servs., No. 18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) (awarding $125,000.00 for pain and suffering); Kelley v. Sec'y of Health & Hum. Servs., No. 17-2054V, 2019 WL 5555648 (Fed. Cl. Spec. Mstr. Aug. 2, 2019) (awarding $120,000.00 for pain and suffering and $4,289.05 in unreimbursable medical expenses); Wallace v. Sec'y of Health & Hum. Servs., No. 16-1472V, 2019 WL 4458393 (Fed. Cl. Spec. Mstr. June 27, 2019) (awarding $125,000.00 for pain and suffering and $1,219.47 in unreimbursable medical expenses); Reed v. Sec'y of Health & Hum. Servs., No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for pain and suffering and $4,931.06 in unreimbursable medical expenses); Knudson v. Sec'y of Health & Hum. Servs., No. 17-1004V, 2018 WL 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $305.07 in unreimbursable medical expenses); Cooper v. Sec'y of Health & Hum. Servs., No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 for pain and suffering and $3,642.33 in unreimbursable medical expenses); Dobbins v. Sec'y of Health & Hum. Servs., No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 in unreimbursable medical expenses); Collado v. Sec'y of Health & Hum. Servs., No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses).

imaging showed possible evidence of partial tearing.[15]   No MRI study was performed in the Cooper case.

During treatment, each of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and all experienced moderate to severe limitations in range of motion.  Moreover, these petitioners tended to seek treatment of their injuries more immediately.  Time to first treatment ranged from five days to forty-five days.  Duration of physical therapy ranged from one to twenty-eight months and eight out of the twelve had cortisone injections.

There are few SIRVA cases where petitioners have been awarded compensation for both actual and future pain and suffering.[16]   In Hooper and Binette, petitioners experienced moderate to severe limitations in range of motion and moderate to severe pain.  The petitioner in Hooper underwent surgery while the petitioner in Binette was deemed to not be a candidate for surgery following an arthrogram.  Despite significant physical therapy, in those cases, medical physician opinions indicated that their disability would be permanent.

---

[15] In Reed, MRI showed edema in the infraspinatus tendon of the right shoulder with a possible tendon tear and a small bone bruise of the posterior humeral head.  In Dobbins, MRI showed a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspects of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  In Meyers, the MRI showed bursitis and a small tear, but no tear was seen during surgery.  In Collado, MRI showed a partial bursal surface tear of the infraspinatus and of the supraspinatus.  In Knudson, MRI showed mild longitudinally oriented partial-thickness tear of the infraspinatus tendon, mild supraspinatus and infraspinatus tendinopathy, small subcortical cysts and mild subcortical bone marrow edema over the posterior-superior-lateral aspect of the humeral head adjacent to the infraspinatus tendon insertion site, and minimal subacromial-subdeltoid bursitis.  In Wilt, the MRI showed a full thickness tear, mild bursitis, moderate tendinosis, and osteoarthritis.

[16] These cases are: Dhanoa, 2018 WL 1221922 (awarding $85,000.00 for actual pain and suffering, $10,000.00 for projected pain and suffering for one year, and $862.15 in past unreimbursable medical expenses); Curri v. Sec'y of Health & Hum. Servs., No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018) (awarding $550.00 per year for future pain and suffering where petitioner had a scheduled loss of use of 22.5% of her left arm); Binette v. Sec'y of Health & Hum. Servs., No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $130,000.00 for actual pain and suffering, $1,000.00 per year for a life expectancy of 57 years for projected pain and suffering, and $7,101.98 for past unreimbursable medical expenses); Hooper v. Sec'y of Health & Hum. Servs., No. 17-0012V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. Mar. 20, 2019) (awarding $185,000.00 for actual pain and suffering, $1,500.00 per year for a life expectancy of 30 years for projected pain and suffering where petitioner had a 50% disability of his left shoulder, $37,921.48 for lost wages).

## V.     APPROPRIATE COMPENSATION IN THIS SIRVA CASE

### A.     Petitioner Is Entitled to Damages for 2018

The threshold question that must be resolved before damages can be awarded is whether the petitioner is entitled to compensation for pain and suffering and out-of-pocket expenses for 2018.[17]  To resolve the issue, the undersigned relies on petitioner's medical records and the expert opinions of Dr. Huffman.

Medical records from petitioner's visit to Dr. Abboud's office on June 15, 2018, authored by Joseph McFarland, NP, state in pertinent part, as follows:

> A very nice lady comes to the office today for a [follow up] visit.  She has not been seen in over a year, I believe it has been a year and a half.  She saw Dr. Abboud originally starting back [in] 2015 secondary to shoulder abnormality she was having due to the flu injection that took place back in 2014.  She believes that she was injected inappropriately [and gave a] description of where the injection took place.  It does signify improper technique and position when the injection was given to her.  All of her problems have started since that point on in her left shoulder.

Pet. Ex. 14 at 21.

At the next visit in July 2018, Dr. Abboud stated that he had not seen petitioner for about two years.  Pet. Ex. 14 at 17.  He then stated that petitioner reported that "her shoulder has been continuously symptomatic."  Id.  Dr. Abboud stated that, "at this point, she has tried conservative modalities, nonoperative management and [is] still symptomatic."  Id. at 17-18.

And in his operative report on August 2, 2018, Dr. Abboud wrote that "[t]he patient is a 29-year-old [] who presents with a long history of pain localized to the left shoulder."  Pet. Ex. 14 at 48.

The above records authored by both Dr. Abboud and his nurse practitioner provide evidence that petitioner had a long history of left shoulder pain dating back to 2014, after she received the flu vaccine.  While it is true that in 2018, both Dr. Abboud and Mr. McFarland reported what the petitioner told them about her history of shoulder pain, this history was consistent with Dr. Abboud's earlier-in-time medical records.  In fact, Dr. Abboud's recommendation that petitioner have surgery in 2018, was due, in part, to the fact that she had continued to have pain since he had last seen her in 2016.  Dr. Abboud's records do not reference any new injury or trauma, or otherwise give rise to an inference that petitioner suffered a distinct

---

[17] This also includes one visit to see Dr. Abboud in February 2019, but the parties generally referenced this issue related to petitioner's shoulder pain, care, and treatment in 2018.

or separate shoulder injury which gave rise to his recommendation for surgical treatment in 2018.[18]

Additionally, the undersigned found Dr. Huffman's expert opinions to be more persuasive than those of Dr. Feeley.  Dr. Huffman opined that while petitioner's cortisone injections gave her some relief, her pain returned due to the "persistent source of inflammation." Pet. Ex. 13 at 1.  Further, he opined that while there were gaps in treatment, the gaps did not reflect new onset shoulder pain, and all of petitioner's treatment, including her 2018 surgery, was related to her initial SIRVA injury.  Pet. Ex. 22 at 2.  As for the later MRI finding of distal clavicle osteolysis, Dr. Huffman explained that this finding was evidence of inflammation at the distal end of the clavicle, caused by the SIRVA injury.  Pet. Ex. 23 at 1-2.  He further explained that the distal clavicle excision performed by Dr. Abboud was the type of procedure often performed in association with rotator cuff surgery.  Id. at 2.  Dr. Huffman concluded that petitioner's entire course of treatment was related to her 2014 vaccination.  Id.

Dr. Huffman's opinions are more persuasive because they are more consistent with the position advanced in Dr. Abboud's records, that petitioner's shoulder problem started after the flu vaccine, and after several years of conservative treatment, she continued to have symptoms that warranted surgical intervention.  Additionally, Dr. Feeley's opinion that distal clavicle osteolysis occurs due to overuse and "not from a direct injury," contradicts his opinion that petitioner suffered a new injury.  Dr. Huffman's explanation that the osteolysis was caused by inflammation from her original injury is more consistent with the petitioner's history and clinical course.

For all of these reasons, the undersigned finds that petitioner's shoulder injury, which occurred in 2014 after her flu vaccination, continued to cause her symptoms, which led her to seek treatment in 2018.  Petitioner is therefore entitled to compensation for pain and suffering and unreimbursed medical expenses as reflected in the medical records and other evidence for 2018 and through to 2019, as discussed below.

**B.      Actual Pain and Suffering**

In this case, awareness of the injury is not in dispute.  The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury.  Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

The medical records establish that petitioner first sought treatment for shoulder pain 16 days after vaccination.  She saw Dr. Testa until March 2015, when he referred her PT.  PT records from March through May 2015 establish that petitioner had moderate loss of motion and

---

[18] In 2016, while Dr. Abboud was on vacation, petitioner saw Dr. Daniel Bronsnick, due to shoulder pain that occurred while she was lifting weights.  Pet. Ex. 6 at 3.  Dr. Bronsnick referred to this as "a new recent injury."  Id. at 4.  However, Dr. Bronsnick only saw petitioner one time, and unlike Dr. Abboud, did not have the benefit of caring for petitioner over her entire clinical course.  Thus, his records carry less weight than those of Dr. Abboud.

function, moderate weakness, and severe pain, described as 8/10.  After attending PT, petitioner reported 15-20% improvement, and her pain decreased slightly to 6/10 to 7/10.  At her sixth and last visit to PT in 2015, her pain remained a 6/10, but her prognosis was documented as excellent.  She had completed the PT program, and had improvement in her function and activities of daily living.  However, petitioner continued to have significant pain.  In June 2015, she saw orthopedist Dr. Abboud and received her first steroid injection.  An MRI revealed moderate supraspinous tendinosis and tear, and mild bursitis.  By August 2015, petitioner was improved, but in September, she reported continued pain to Dr. Testa.

Petitioner returned to see Dr. Abboud in March 2016, and she received her second steroid injection for her pain.  A second MRI was performed that showed a reactive area of bony impingement.  Subsequently, in May 2016, petitioner aggravated her shoulder injury while exercising at the gym.  Petitioner's third MRI showed mild supraspinatus and infraspinatus tendinosis with mild interstitial tearing and minimal subacromial/subdeltoid bursitis.

In June 2018, after continuing to have symptoms, petitioner returned to see Dr. Abboud. Petitioner's fourth MRI showed rotator cuff tendinopathy with a low grade tear of the supraspinatus, and intense bone marrow edema of the distal clavicle with subchondral resorption. Due to failure of conservative treatment, Dr. Abboud recommended surgery.  And due to increased pain, the surgery date was moved up.  On August 2, 2018, Dr. Abboud performed left shoulder decompression and distal clavicle resection.

Postoperatively, petitioner attended PT.  Documentation from those visits show that she had only mild pain, a range of 2/10 to 4/10.  At the end of PT in October 2018, petitioner had residual pain, stiffness, soreness, and weakness.  By November 2019, petitioner was much better, with full range of motion and good strength.  At her last visit to Dr. Abboud in February 2019, petitioner was doing fairly well and had no significant pain.  Dr. Abboud did not document any permanent disability or concerns regarding petitioner's future prognosis. There were no further records filed by petitioner.

Due to the gaps in treatment, and the fact that petitioner did not have one continuous course of treatment, it is difficult to establish the severity and duration of her injury.  The medical records and affidavits establish that she had severe pain for approximately nine months, from her September 30, 2014 vaccination until her first steroid injection in June 2015.  In 2016, the evidence establishes that petitioner had pain and required another steroid injection in March, and then aggravated her injury, requiring additional medical care through July and August 2016. This second period of treatment was approximately six months.  This time frame is followed by a lengthy gap in documentation until June 2018, when petitioner sought treatment.  Petitioner had significant pain from June 2018 leading up to surgery in August 2018.  She had postoperative pain and attended PT through October 2018.  After surgery, except for stiffness and some tenderness, petitioner did well.  This last period of treatment including surgery and PT lasted approximately five months.

In summary, petitioner's medical records establish that she suffered a moderate-to-severe SIRVA injury, for which she sought treatment during periods of time that total approximately 20 months, with gaps of time during which she did not seek treatment.  During these periods of

treatment, petitioner had two steroid injections, attended 14 PT appointments, had four MRI studies, and underwent shoulder surgery.  After October 2018, the records document good range of motion, good function, and there is no documentation of pain.

Other than petitioner's testimony, there is no evidence that petitioner experienced severe pain for the entire period of time after vaccination until surgery almost four years later, or that she continues to experience severe pain.  Petitioner's medical records show periods of improvement and there are periods of time when she did not seek treatment.  While there is a gap in time attributable to lack of insurance, the other gaps of time during which petitioner did not seek treatment suggest that her pain during those times was not as severe.  As previously held by the Federal Circuit, it is appropriate for a special master to give greater weight to evidence contained in medical records created closer in time to the vaccination.  Curcuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Medical records are the most reliable evidence about a petitioner's medical condition and the effect it has on daily life.  Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 537-38 (2011) ("There is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").  Further, the gap in treatment reflected in the relevant medical records after May 2016 until June 2018 leaves the valuation of petitioner's pain and suffering challenging.  See, e.g., Marino v. Sec'y of Health & Hum. Servs., No. 16-622V, 2018 WL 2224736, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).

The undersigned has reviewed the cases cited by both petitioner and respondent to support their respective positions on the appropriate amount of an award for pain and suffering.  Additional SIRVA damages awards where petitioners have had similar clinical courses have also been reviewed.  Each case is very fact specific and no single decision or award of compensation necessarily accounts for the specific circumstances in this case, however, the Reed case provides a frame of reference for damages here.  See Reed v. Sec'y of Health & Hum. Servs., No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

Like Ms. Reed, petitioner was seen first seen for shoulder pain soon after vaccination.  Ms. Reed had a period of severe pain lasting approximately six months, and she rated her pain 9/10 to 10/10.  Petitioner here had a longer period of severe pain for nine months, and the records document significant pain again prior to surgery in 2018.  However, unlike petitioner, Ms. Reed had severe limitations in her range of motion.  Both had cortisone injections, although petitioner had two and Ms. Reed had only one injection.  Both had significant MRI findings, and both were referred to PT.  Petitioner attended 14 PT sessions, whereas Ms. Reed attended 18 PT sessions.  Both had surgery followed by PT.  Finally, both petitioners complained of not being able to participate in activities that they had previously enjoyed.  Significantly, petitioner had a longer overall period of treatment and was younger than Ms. Reed when she sustained her injury.

Petitioner argues that the Hooper case is most analogous, and while there are some similarities, there are also distinct differences.  Hooper, 2019 WL 1561519.  Mr. Hooper had a very severe case, described by his physician as the "worst case of frozen shoulder caused by [the] flu vaccine."  Id. at *3.  Mr. Hooper's shoulder was also described as "nearly useless."  Id.  The undersigned does not find petitioner's clinical course or result to be nearly as severe as that experienced by Mr. Hooper.

Based on a review of the entire record and consideration of the facts and circumstances presented here, as well as the cases cited by the parties, the undersigned finds that $170,000.00 is an appropriate award for petitioner's actual pain and suffering.  The increase over what Ms. Reed was awarded for pain and suffering ($160,000.00) reflects petitioner's young age at the time of her vaccination as well as the duration of her injury.

### C.    Future Pain and Suffering

In her brief, petitioner asserts that the petitioner in Hooper suffered "residual pain and limited range of motion, including a permanent loss of shoulder function" and "[h]ere, petitioner's prognosis and [] ongoing nature of her pain and suffering is similar to, if not more severe than that of the petitioner in Hooper."  Pet. Br. at 9.  Petitioner states that she is now 30 years old, and her ongoing suffering will be longer than the petitioner in Hooper.  Id.  She also argues that her career has been adversely affected, and she is concerned about how long she will be able to continue to work as a dental hygienist.  Id.  Petitioner also argues that her injury is permanent.  Id.  For these reasons, petitioner seeks $50,000 for future pain and suffering.  Id. at 11.

There are only a few reasoned SIRVA damages decisions where petitioners have been awarded compensation for future pain and suffering.  See Dhanoa v. Sec'y of Health & Hum. Servs., No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018); Curri v. Sec'y of Health & Hum. Servs., No. 17-432V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. Oct. 31, 2018); Hooper, 2019 WL 1561519.

Here, the undersigned finds that the evidence is insufficient to support a claim of permanent injury.  In Hooper, the records included a 50% disability rating of Mr. Hooper's left arm function.  Hooper, 2019 WL 1561519, at *4.  In Curri, the records included an orthopedist evaluation of "permanent 'scheduled loss of use' of 22.5 percent of [the] left arm."  Curri, 2018 WL 6273562, at *2.  While petitioner asserts that her injury is permanent, she has not submitted a disability rating or medical record from a medical professional to support her position that her injury has caused permanent disability.  To the contrary, in November 2019, Dr. Abboud noted that petitioner was much better and that she had full range of motion and good strength.  At her last visit to Dr. Abboud in February 2019, petitioner was doing fairly well and had no significant pain.  Dr. Abboud did not document any permanent disability or concerns regarding petitioner's future prognosis.

Petitioner bears the burden of proof with respect to each element of compensation requested and the medical records are the most reliable evidence of petitioner's condition.  Brewer, 1996 WL 147722, at *22-23; Shapiro, 101 Fed. Cl. at 537-38.  Based on the medical records of petitioner's treating physician, Dr. Abboud, and without medical evidence demonstrating the likelihood that petitioner's shoulder injury, more likely than not, will extend well into the future, as well as the lack of evidence indicating that her shoulder injury is permanent, the undersigned finds that an award for future pain and suffering is not appropriate.

### D.      Award for Past Unreimbursed Expenses

Petitioner agrees with respondent's assessment of out-of-pocket medical expenses prior to 2018, which total $1,780.45.  Pet. Supp. Br. at 6.  Petitioner requests $146.15 for additional treatment costs related to care she received beginning in 2018, for a total of $1,926.60 in out-of-pocket expenses.  Id.  The undersigned finds these additional costs to be compensable and reasonable, and awards them in full.  Therefore, the total award for out-of-pocket costs is $1,926.60.

## VI.      CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

For all the reasons discussed above, the undersigned awards the following compensation:

**A lump sum payment of <u>$171,926.60</u>, representing $170,000.00 for petitioner's actual pain and suffering and $1,926.60 for related out-of-pocket medical, in the form of a check payable to petitioner, Heather Tumolo.**

This amount represents compensation for all damages available under 42 U.S.C. § 300aa-15(a).

The Clerk of Court is directed to enter judgment in accordance with this decision.[19]

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Special Master

---

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.